and Davidson County, Tennessee, et al. Oral argument, 15 minutes per side. Mr. Mothershead for the appellant. Good morning, Your Honors. May it please the Court, Kyle Mothershead for the appellant, Michael Chrestman as conservator for his sister Arrington Bay does not apply to custom claims and this is the fundamental error of this case. It was the fundamental error that happened in the district court. It's a conceptual error. It's a legal error and it is incumbent on us, hopefully today, to fix it. So Arrington Bay, of course, established that to make a municipal liability claim on a failure to train issue, you've got to be able to show that it was a clearly established constitutional violation. So the city has notice to undertake these training obligations. Arrington Bay did not say what to do with the custom claim, but it divided the world into policy and formal act claims, which don't have a clearly established law requirement, and failure to train, which do. Of course, Owen would have been violated if policy and formal act claims had suddenly had a clearly established law requirement. Owen, the floor is yours. Can your municipal liability claim survive if the tasing and shooting claims don't? Well, the district court found that they were Fourth Amendment violations. And so the officers might get qualified immunity, but the claim can survive as long as it's a Fourth Amendment violation caused by a custom. Because a custom is in the same box as policy. Arrington Bay doesn't state that. Arrington Bay is silent about it. But Morgan... If there's not a clearly established violation, then the municipal liability claim has to fail. Only for failure to train. That's what Arrington Bay says. That says that for failure to train claims. For policy claims, for affirmative act claims, clearly established does not apply. If it's a Fourth Amendment violation, that's resulting from the city's act. What is the policy problem here? I can understand you saying there's a failure to train these officers not to tase or shoot mentally ill people, but what is the policy? It's a custom. What we've alleged, what we attempted to allege, the court denied the motion to amend, but the proposed First Amendment complaint, it went through a whole sweep of a combination of malfeasance and nonfeasance to establish a custom of impunity with regard to excessive force by MNPD officers. That's what was alleged, or attempted to be alleged, in the proposed complaint. So in the operative complaint that concerns us, that's not alleged? The district court denied the motion to amend on futility grounds, and then your judgment on Rule 12. I think it does concern us. It's before us. It's not alleged. The motion to amend was denied based on futility, based on these Errington Bay principles. I certainly think that's before the court, whether the motion to amend should have been granted. Can we talk about the personal capacity claims? One question I have is, we're on the motion to dismiss, normally we just look at the complaint, but we also have a video here. My read of the video, or my read of the complaint, is a lot of what's in the complaint was taken from the video. Now, you may disagree with that, maybe not, but at this stage, how do we view the complaint and the video? How should we look at that? The Sixth Circuit has spoken on this several times now, that just because a video might supplement a complaint, fill in some gaps, doesn't mean we turn to the video. We only turn to the video if it blatantly contradicts the complaint, which it really doesn't here. It might fill in some gaps, but the complaint absolutely mirrors so much of the video, and so it should have just been decided based on the complaint. There is this piece of this case, on the shooting side of it, whether the shooting was a clearly established violation or not, that may turn on the video, because the district court viewed it as she's charging him. I think if you look at the video, she's taken a couple of steps, there's still time and space. It's unclear what's coming next, and so under Sova, and another more recent case named Levy-Ross, that is a clearly established violation to shoot, where there's not an imminent threat, there's still time and space, you have a melee weapon that's far enough away, but there's not an imminent threat, but I do think if she's charging as the district court viewed it, well, then there is qualified immunity. I see the role of the video for that one piece, however, none of the video blatantly contradicts the complaint. The complaint is incredibly consistent with the video, in fact, very much drawn from the video, so the district court should have just denied Rule 12, just based on the complaint, which is what's supposed to generally happen. These cases are supposed to be generally resolved on Rule 56, not on Rule 12, particularly on custom claims, for customs of impunity, and if we look at cases like- Before you go back to the municipal liability, I kind of want to stay for a second with the personal claims. Understood. You're right, that our precedent says, and the Supreme Court has said, that unless the video blatantly contradicts what is alleged in the complaint, then we don't look at it for anything else. It's only those questions. But our precedent also talks about the fact that if there are omissions in the complaint that result in a blatant contradiction, then we can look, since we have to consider, since the standard is the totality of circumstances, we look at all of those circumstances, and to the extent that really important parts, for instance, might not be included in the complaint, would you agree that we're permitted to look at the video? I agree, and if we're talking about just this one snippet, I certainly don't have a problem with this panel looking at the video. Is she charging? Well, isn't it more than if she was charging, though? Don't we also listen to the words that she was saying to the officers, to the extent? Because the standard that we have to look to here is whether or not a whether it's objectively reasonable, right? So we take into consideration everything that those officers were seeing at the time that both the tasing happened, and at the time that the shooting happened. All she said to them was that they were going to kill her. She never said she was going to harm them. So her words- On the statement she made about, I'm going to do something to you, at one point in the video, early on, at the beginning of the six-minute confrontation, where she seemed to be making some threat if they approached her. Well, I mean, I'll defer to your Honor's recollection on that, but it certainly was a stable situation. She certainly was not approaching them. She certainly was backing off. The video is very clear about that. She's backing off. Every time they try to get closer, she backs away. She never actually did anything. Tell us about, not the shooting, but the taser that Williams did. Why do you think that that gets past qualified immunity? So, I mean, there's not a case directly on point, and I think that has to be acknowledged. But the medical emergency test, it's articulated in the State of Hill. She's not under arrest. They never placed her under arrest. This is a medical emergency case. She's not actively or passively resisting arrest. She's not under arrest. So, the State of Hill says, if we're dealing with a medical emergency, there has to be an imminent threat in order to use force. Well, there's not an imminent threat. The situation is totally stable. Everything is stable. And Williams is clear in the statements he's making that nobody should provoke her. He says that. And nothing is happening in that moment other than him running out of patience and just giving up on de-escalation. And he just suddenly tasers her. And so it is an obvious case. It is the rare obvious case in which that test, which says there needs to be an imminent threat in order to use force, is enough. But I do think the municipal liability issue is incredibly important. I think the custom claims get past Rule 12. And many of them fail on Rule 56. Not all of them. But they get past Rule 12. When you're talking about a custom of excessive force, a custom of impunity, those get past Rule 12. And those are not Arrington Bay. They don't require clearly established violations. I must say, your custom of excessive force sort of bleeds into, well, the custom is they're not training the officers properly. Well, it's far more than that. If you review the sweep of the complaint, they're justifying, in an earlier case, a criminal homicide that occurred. They're failing to discipline in many instances. They're interfering with public efforts to enhance officer accountability. There's a whole package of things. And we have cases like Wright v. City of Euclid, which package improper training with a sort of generalized failure to discipline. And there's another case, Simpkins v. Boyd County Fiscal Court, that packages a Department of Justice report with five instances of prior conduct. And the dissents say, well, five instances isn't enough. We've seen in other cases that five instances isn't enough. The majority says, well, look, but it's packaged with this Department of Justice report. So that connects it together. And that makes it enough. That's Rule 56. We're at Rule 12. We're at Rule 12. Your point is, even if we upheld qualified immunity for the two officers, we still should be pursuing the city of not Nashville. Right. Which is what the district court originally did. That is what the district court originally did with this case. And then just suddenly out of left field, you know, six months later on this Rule 12 motion, Judgment for Pleas denied our motion to amend and killed it on Arrington Bay, even though there's both a custom claim and a failure to train claim. And that's a mistake. And it needs to be fixed. Thank you. Thank you. May it please the court. Allison both bustle on behalf of officers Williams and Lopez and the metropolitan government of Nashville and Davidson County. May it please the court. This court should affirm the trial court's judgment in favor of the defendants because defendant officers Williams and Lopez did not use excessive force on March 12th, 2021. And the law gave them no notice otherwise. And to Metro Nashville cannot be held liable where there was no constitutional violation or no clearly established, clearly established constitutional violation based on the theories of municipal, municipal liability in the plaintiff's complaint. I would first like to address the question of whether the video may be properly considered on this motion. And it can be for two reasons. First of all, the plaintiff invited the district court to consider the video. It defies logic that a plaintiff could essentially ask a trial court to incorporate video into its complaint and then object to that on appeal when the outcome was not favorable. I guess, what are the limitations on that? Is it the sort of, we look at it for blatantly contradicts or omits, or we can just look at it and take it for what it's worth? Yes, your honor. And judge, that's the second reason the video can be considered insofar as plaintiff wants to suggest that the video can't be considered at all. That's not true because he waved that argument below, but also the video plainly contradicts both affirmative allegations in the complaint and omissions in the complaint. And this court in Bellevue City of Southfield and more recently in the Hodges decision has made clear that blatant contradictions, which can include an omission, allows the court to consider video. What is the blatant contradiction that you think is in the video? That's a great question and that's where I was headed next. The first one comes in paragraph 87 of the complaint. In that paragraph, the plaintiff alleges that, quote, suddenly and for no apparent reason, Officer Williams activated his taser. If you actually take a look at the video, and in fact, Judge Campbell mentions this in his ruling, there's a shift in the events 30 seconds before the taser is activated. And that shift in the events is Ms. Wooden's mother drives up on an electric cart, approaches her daughter, and the situation intensifies. You have arms waving, you have mom and daughter arguing with one another, and Ms. Wooden actually says in that moment, in that 30-second time frame, mama, you're not going to ruin this for me. Mom says, you're going back to the hospital. And Ms. Wooden raises the deadly weapons, long-handled pickaxe and a baseball bat, higher above her head. And then mom says, I'm backing up, and two seconds later the taser is activated. So to suggest that this was suddenly and completely out of the blue is blatantly contradicted by the video. Well, you say that, but actually she was lowering those weapons at the moment she was tased. And what bothers me, Officer Williams says that the reason he tased her was, quote, the situation wasn't going anywhere, and he gave up. Well, that's not exactly because, oh, I feared for my life. He was just annoyed that it had been six minutes and it hadn't been resolved. Is that a legal basis for him to tase her? Respectfully, Your Honor, Officer Williams' subjective belief in that moment is irrelevant to the Fourth Amendment inquiry. But secondly, the reason that the law says very plainly, and Plaintiff's Counsel has cited not a single case to suggest otherwise, that Ms. Wooden could be tased in that moment is because she was actively resisting, by any definition this court has had. I would refer the court to the Saiye case. Actively resisting what? I mean, she wasn't under arrest, so what do you mean actively resisting? Right. And the Kelly v. Sines case that we cite in our brief says, for purposes of active resistance, the question doesn't have to be, are you resisting an actual traditional custodial arrest? Are you trying to keep them from taking you into custody? Are you doing things like saying things trying to provoke the police officers? She said, I want you to kill me, repeatedly. She, in fact, was the one who called 9-1-1 and reported that she wanted to be killed. Once Officer Williams gets there and she says, I want you to kill me, at that point, they could have tased her, they could have shot her, at that point? Well, they can't shoot her. The taser is a separate use of force from the shooter. But they could have tased her right then? I believe the combination of backing away, refusing commands to put her deadly weapons down and making statements that go beyond argumentative, statements that are trying to provoke the officers, which is exactly what the court held in Sa'ivi, West Bloomfield Township, which is cited in our brief, exact same situation. You have a depressed, suicidal, intoxicated person who is trying to provoke the officers to kill him, refusing commands to be handcuffed and moving away from them. And the court held that, not just that it was clearly established, but that was active resistance that justified the use of a taser. What's the name of the case you cited? Sa'ivi, that's C-A-I-V-I, West Bloomfield Township. And that is in our brief. Wait, wait, in that case, they had actually wrestled him, they had taken him to the ground and then he refused to move his hands behind his back so the officers could handcuff him. That's the point at which he was tased. That's additional active resistance noted out. Well, but that's not our case. It is distinguishable on the facts, but the court held that it was active resistance for similar reasons. Here, this is how the court defines active resistance. Physical force, a show of force, or verbal hostility coupled with a failure to comply with orders. Verbal hostility sometimes is referred to as verbal antagonism. I would also refer the court to Keene v. City of Rockford, which was a case in which Judge Davis served on the panel, and there the court said those things, this verbal antagonism can contribute to that, but the important point to be made from that case was if it's close to the line, if we're not sure if this is active resistance or not, then qualified immunity must be granted. I thought Keene was a summary judgment case. Which is not relevant to the question of whether it's active or passive resistance. For the legal principle I'm citing Keene for, it's equally applicable on a motion to dismiss. Oh, it's a big difference between the motion to dismiss and summary judgment, though, because all the plaintiff has to show at motion to dismiss things are that it's a plausible theory. Based on clearly established law. Based on the case law, what I believe Judge Mathis said, that you don't have to . . . generally you don't grant qualified immunity on motions to dismiss. You usually do it only on summary judgment. This court has . . . There's a chance for discovery. This court also has said there is not a bar to granting qualified immunity on a motion to dismiss. It's highly unusual, I think, is what this court said, isn't it? And I would suggest that as the case law has evolved over time to permit consideration of video where there are contradictions in the complaint, that is less of a rarity. Because the record is developed. This is not about whether . . . it's not about what actually happened. It's about that video essentially becomes part of . . . When you view the video, you think that Williams is right that she was charging toward Williams before she was tased? No, Your Honor. And the . . . I believe that the charging word that you're asking about was actually related to the shooting. So that's . . . One being she wasn't charging when she was tased. You claim the video shows she was charging when she was shot? I've never claimed that, for what it's worth. The district court used that term. What we said was she was moving toward Officer Williams with deadly weapons above her head at a distance of about 10 feet. So from where you are to my colleague. And so whether it was . . . That's more like 20 feet I would say. Well then it was closer than that. More than . . . I mean a lot of your cases where there's been qualified immunity found was where there was a person holding a knife over their head and they were within 5 feet or 4 feet or 7 feet of the officer. Or in Summerfield where it was an ax within 23.8 feet. And the court found not clearly established, but that it was not a constitutional violation. And the point of all of that . . . So Rusinski, a knife within 5 feet, a handheld knife. Not a long-handled pickaxe that could be thrown and swung and certainly at a greater distance than a knife. Chapel, a knife within 5 to 7 feet. Rhodes, a knife within 4 to 6 feet. And again, Summerland, an ax within 23.8 feet away and the court held no constitutional violation. There's no way that Officer Lopez could have known under these circumstances in the face of that Summerland case that what he was doing, that every reasonable officer would have known in that moment that he could not pull the trigger. I mean I said that according to the video, Lopez was in no danger at all. Lopez was sort of behind and to the side of her, right? He wasn't claiming she was charging or moving toward him, I guess he claims she was moving toward Williams. Well, again, Your Honor, we would encourage the court to focus not on what the officers said or said were their subjective beliefs. I think that the reasonable officer on the scene would shoot in that moment or certainly not know that they couldn't shoot in that moment to protect their fellow officer. Deadly force is reasonable if an officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer. She was moving toward, theoretically, Williams. Williams didn't pull his gun out to shoot her. Which is also irrelevant, Your Honor, for clearly established law purposes. The question is whether every reasonable officer would know based on existing law, not cases like Palma and Gambrel that came after the shooting, but based on existing law. So cases like Summerland and Sayeed, whether they, that what they were doing was unconstitutional. And there just are no, plaintiff still hasn't cited a case. I have not found a case that would have told these officers that what they were doing. There's a second case today that's the first impression then, am I right? We would submit that the record establishes that she was actively resisting and that a single taser activation was permissible. That's our position. But at worst, the law did not tell them that what they were doing was unconstitutional, which is what Judge Campbell found. So as a result of that, I do want to fast forward and address some misstatements in plaintiff's counsel's argument about the Monel Municipal Liability Argument. Arrington Bay says where the theory is one of a failure to train, a clearly, a no clearly established law finding is dispositive of the municipal liability claim. And the reason for that is because the culpability standard under Monel is deliberate indifference. It is false that the court has not extended that to custom or tolerant, custom of intolerance claims or inaction claims or failure to supervise claims. That is false. This court did that in Campbell v. Riyahi in 2024 and the plaintiff continues to ignore that case. It's cited in our brief. It was cited at the trial court. That case says where the requirement is one of deliberate indifference, you cannot, as a matter of law, you cannot establish that requirement if the right was not clearly defined, if it was gray, if it was murky, like in King v. City of Rockford. That's exactly what we have here. We have a complaint, a finding of no clearly established law that would have put the officers on notice that what they were doing, it was beyond debate. No officer, every single officer would have known that they could not shoot in that circumstance because that was not clear. The municipal liability theory of you failed to train them sufficiently about the right at issue, or you failed to supervise your officers about the right at issue, or you just had this custom of tolerating these types of uses of force. That theory requires a showing of deliberate indifference. And if the right was not clear, then the government did not have notice of a problem such that they would have been deliberately indifferent to that problem. And the plaintiff still has never responded to that argument. Keep in mind, this truly is a waiver situation. Below all the plaintiff argued, the plaintiff has never disputed until it sort of sounded like maybe a few minutes ago that the theories of municipal liability required a showing of deliberate indifference. Now there's been sort of this suggestion that that's not required to establish the theories. I would point the court to our brief at section 2B1 of the legal analysis. That's where we break down the municipal liability theories and we show what is required for each of those. Counsel, we can go back to the personal. Just briefly, I still struggle with why we shouldn't apply our general rule, which is courts shouldn't grant qualified immunity at the motion to dismiss state. I understand we have a complaint. I understand we have a video, but why shouldn't our general rule apply? I do want to . . . I don't think it is accurate to say that that is a general rule that then sort of has to be rebutted in some circumstances. The general rule from the U.S. Supreme Court is that qualified immunity must be resolved at the earliest possible stage. We have said that that's usually a summary judgment, right? If there is some question about whether a clearly established right could be alleged, I agree with that. The problem is, again, to this day, plaintiff has not cited a single case, and I have not found one, that would have put these officers on notice that tasing Ms. Wooden, who had clearly tried to provoke officers to kill her and was wielding deadly weapons above her head, tasing her one time to try to take control of the situation that her mother had inflamed was unconstitutional. Nor is there a single case that would have told Officer Lopez that he could not protect his fellow officer, who she had moved toward with deadly weapons raised above her head, at a distance of 10 feet. And that's why this case can and should be resolved on the complaint. Where does your distance of 10 feet, where does that come from? Is that looking at the video? It's in the complaint. I think that might be generous based on my sort of layperson view of the video, but we will accept, for plaintiff's purposes, that 10 to 15 feet is the distance. And I would submit that under the Summerland case, which permitted use of an axe at 23.8 feet, it was dark and the person was running. So that is a factual distinction, but it's 23 feet away. I would suggest that at least makes it a gray question, and therefore qualified immunity is justified under that King case. Thank you so much. Your Honor, obviously, Summerland is different because we're talking about charging, right? So again, we're talking about charging, which is not the case here. So 20 feet away with an axe charging, not this case. We are at Rule 12. And one of the allegations in the complaint was that Lopez did not even actually perceive a threat when he shot Ms. Wooden, that it was a miscue of the signals, that it was the suddenness of Williams tasing her, that their communication was off, that he just reactively shot her, and then they came up with this after the fact to say, oh gosh, well this is what we have to say now that I've shot her. What about counsel's statement or point that it's an objective standard, and so what he subjectively believed is not really what we're evaluating? Well, we need to take depositions and take discovery to be able to evaluate the objective circumstances. I mean, it's just too early in the case. We're at Rule 12, and we've alleged in the complaint that he didn't have objective circumstances to base a threat perception on. And there are pieces that are corroborated in the video that corroborate that. I mean, you have Williams saying, I guess the signals need work, and I didn't really feel under threat. He doesn't say those words, but he just about does. And so that allegation is strong enough to get us past Rule 12, that there really was no threat to Williams from Lopez's perspective when he shot her. It's just an ex post justification. Municipal liability, again, Campbell is pure inaction. Campbell is pure inaction, that's why it doesn't apply. Okay? Our custom theory is a amalgamation of affirmative misconduct, affirmative justification of a criminal homicide, affirmative efforts to disrupt attempts to enhance officer accountability. Affirmative distribution of a seriously problematic training manual that promotes violence. Also inaction, also failure to discipline, but it's this combination. And so it is an affirmative custom, which for Arrington Bay purposes, is the equivalent of a policy. It's harder to prove than a policy, right? Once we're at Rule 56, it's harder to prove than a policy. But it's for Arrington Bay purposes, it's the equivalent of a written policy. It's an unwritten policy, that's what a custom is, a custom of impunity with the use of excessive force. What is your response to her citation to Campbell versus Riayhi? Campbell, if you read it, it's all pure inaction. It's all pure inaction theories. So it's not dealing with a custom of affirmative misconduct. It's dealing with pure inaction, pure failure to take action. Here we have a mix of affirmative misconduct and failure to take action that should be taken that amounts to a de facto, unwritten custom of impunity with regard to excessive force. So it's on the policy side of the Arrington Bay line. It's in the Owen territory. It would really violate Supreme Court precedent to say that you have to have clearly established violation in order to find a municipality liable on a custom theory, where you're talking about a custom of illegality. It's just a causation and proof issue, and that's a Rule 56 issue and a trial issue, not a Rule 12 issue. I think that looking at Owen itself is incredibly instructive. Just thinking about the principles that ground municipal liability, Owen itself addressed a situation of changing law, which we also have here because now Barnes v. Felix and then Hodges, the segmented approach is gone. The law has changed this year when we're talking about excessive force cases. There's no more segmented approach. And so maybe, you know, Williams and Lopez can fairly say, well, that wasn't the law when we did this. That counts for qualified immunity. But for the city, well, Owen says, look, even if the city is acting in good faith and it has good public aims, right, and they're public aims that are not evil, and having this custom might be, well, we want to support our officers. We need our officers for public safety. We want them to feel supported. We want them to feel like they're definitely going to be able to go home to their families at night and that they'll be able to make sure their teammates go home to their families at night. There might be very good public good reasons to have this custom of impunity, this custom of allowing excessive force. Owen says, Owen's answers the question of who pays the cost for this custom when somebody gets hurt, when somebody's constitutional rights are violated in a way that wasn't clear on the front end, that maybe it was undertaken in good faith, who pays the tap? And Owen says, the city pays the tap, not Ms. Wooden, not the Ms. Woodens of the world who gets shot, even if this custom, this policy is undertaken in the most good faith for the best public good reasons. Does the panel have any other questions? Counsel, thank you for your arguments and your briefing in this matter. It will be submitted.